**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

NOV – 2 2015

CLERK, U.S. DISTRICT COURT
By_____
               Deputy

| | | |
|---|---|---|
| **RONALD G. BECKER** | § | |
| **PLAINTIFF** | § | |
| | § | |
| **Vs.** | § | **CIVIL ACTION NO. 4:13-CV-520-BJ** |
| | § | |
| **CONTINENTAL MOTORS, INC.** | § | |
| **DEFENDANT** | § | |

**MEMORANDUM OPINION WITH FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

## I.   INTRODUCTION

Plaintiff Ronald G. Becker ("Becker") filed suit to recover damages allegedly incurred as a result of problems with an airplane engine Becker purchased from Continental Motors, Inc. ("Continental").  On May 30, 2013, Becker filed a petition in state court alleging claims against Continental for (1) breach of contract and express warranty, (2) violations of the Texas Deceptive Trade Practices Act ("Texas DTPA"), and (3) declaratory relief.  (Pl.'s Pet. at 9-13.) Becker sought recovery of the "costs incurred by Becker to acquire and install the defective engine from Continental, Becker's lack of an ability to use his aircraft since September 5, 2012, . . . including both the intrinsic value associated with owning and operating his own aircraft, expenses associated with flying commercially as opposed to being able to utilize his own aircraft, the value of his lost time and attorney's fees incurred." (Pl.'s Pet. at 9.)  Continental removed the case to this Court on June 27, 2013.[1]  After careful consideration of the evidence and arguments presented at trial and all of the written submissions by the parties, the Court issues this memorandum opinion with findings of fact and conclusions of law.

---

[1] After the parties consented, the case was transferred on September 3, 2013 to the docket of the undersigned.

## II.    GENERAL FINDINGS OF FACT[2]

1.    Becker is a resident and citizen of Texas.

2.    Continental is a corporation formed and registered in Delaware with its principal place of business in Alabama.

3.    The amount in controversy exceeds $75,000.

4.    Jurisdiction and venue is proper in the United States District Court for the Northern District of Texas, Fort Worth Division.

5.    Becker is the owner of a 1999 Mooney Ovation M20R aircraft (the "Aircraft"), bearing registration number N321EL.

6.    In late 2010 and/or early 2011, the engine in Becker's Aircraft was approaching 2,000 hours of operational time, which is the recommended "Time Between Overhaul" per the manufacturer, Continental.

7.    The Aircraft is certificated by the FAA and is suitable only for a Continental IO-550-N8B Engine.

8.    Becker researched his options at such time in terms of either a field overhaul, a factory remanufactured engine, or a new engine from Continental.

9.    Following such research, Becker, in part based upon his reliance on the New Engine Warranty and/or Cylinder Warranty that would accompany a new Engine from Continental, elected to purchase a new IO-550-N8B Engine with serial number 1004170 (the "Engine") that was manufactured and sold by Continental.

---

[2] Unless otherwise indicated, all findings of fact are supported by a preponderance of the credible evidence admitted at trial.  In addition, to the extent any finding of fact is more properly construed as a conclusion of law, it is adopted as such.  To the extent any conclusion of law is more properly construed as a finding of fact, it is adopted as such.

10.   The relevant portion of the "New Engine Warranty" stated:

> 1. (a) For a period of thirty-six (36) months or one thousand (1000) hours of operation, whichever occurs first, after the warranty activation date TCM [Teledyne Continental Motors] will at its option repair or replace on an exchange basis any engine, component or part manufactured or supplied by it which within the thirty-six (36) month or one thousand (1000) hour period is returned to a TCM representative authorized to handle the engine covered by this warranty and which upon examination is found to the satisfaction of TCM to be defective in material or workmanship. . . .

11.   In addition, the relevant portion of the "Cylinder Warranty" stated:

> 1. For a period of twenty-four (24) months or one thousand (1000) hours of operation, whichever occurs first, after the warranty activation date, TCM will at its option repair or replace on an exchange basis any cylinder component or related part manufactured or supplied by it which within the applicable twenty-four (24) month or one thousand (1000) hour period is returned to a representative of TCM authorized to handle the engine in which the cylinder component or related part covered by this warranty is installed and which upon examination by TCM is found to be defective in material or workmanship. . . .

12.   Moreover, the Cylinder Warranty contained the following language:

> THIS WARRANTY IS A WARRANTY TO REPAIR OR REPLACE AND NOT A WARRANTY OF THE CONDITION OR FUTURE PERFORMANCE OF THE PRODUCTS WHICH IT COVERS.   THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, SPECIFICALLY, BUT WITHOUT LIMITATION, THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  IN NO EVENT WILL TCM BE RESPONSIBLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY DEFECT IN ANY CYLINDER OR RELATED PART, ARISING OUT OF THE FAILURE OF ANY CYLINDER OR RELATED PART TO OPERATE PROPERLY, OR ARISING OUT OF ANY BREACH OF THE WARRANTY MADE HEREIN. . . .

13.   The Engine Warranty contained language almost identical to that set forth in paragraph

12.

14.   Upon purchase by Becker, the Engine was properly installed by Stephen Sherman

("Sherman"), an aircraft mechanic at Dugosh Aircraft Service Company ("Dugosh"), in

Becker's Aircraft in April 2011, in accordance with Continental's instructions and specifications.

15.   In his 15 years working as an airplane mechanic at Dugosh, Sherman has replaced approximately 15 to 20 engines and replaced approximately 200 sets of cylinders.

16.   Since approximately 1999, Sherman has performed work on various aircraft owned by Becker, including the Aircraft.

17.   Becker operated his Aircraft with the Engine from approximately April 2011 to September 5, 2012 for a total of 336.5 hours.

18.   Becker brought his Aircraft to Dugosh on or about September 5, 2012 for routine maintenance and repairs.

19.   Following performance of the routine repairs and maintenance service by Sherman at Dugosh, the Aircraft was certified as airworthy and had been signed off by and approved for return to service by Dugosh.

20.   Immediately following Dugosh approving the return of Becker's Aircraft to service on or about September 5, 2012, Becker reported to Sherman at Dugosh that he believed the Engine to have a high oil consumption rate of approximately one quart for every two hours of operation.

21.   That same day, Sherman at Dugosh contacted Continental's warranty department (Roger Gradle ("Gradle"), Warranty Administrator) to report the high oil consumption issue under both the New Engine Warranty and/or Cylinder Warranty applicable to the Engine.

22.   Based on such report, Gradle at Continental instructed Sherman at Dugosh to complete and submit a Warranty Claim Form to Continental.

23.   On September 5, 2012, Dugosh submitted a warranty claim form to Continental related to the high oil consumption issue reported to Continental.

24.   The Warranty Claim Form listed Becker as the Customer/Owner and Dugosh as the Repair Agency.

25.   The Warranty Claim Form included a "Description of Difficulty" of: "High oil consumption-1 quart every 2 hours; Crankcase pressure normal; Borescope shows oil in cylinders[.]"

26.   The Warranty Claim Form was submitted within the applicable warranty periods under both the New Engine Warranty and Cylinder Warranty.

27.   Both the New Engine Warranty and the Cylinder Warranty apply only in the event that the Engine or cylinders are, "upon examination by" Continental, found "to be defective in material or workmanship."

28.   Following submission of the warranty claim form to Continental, Continental instructed Dugosh to remove the cylinders from Becker's Engine and to send those cylinders to G&N Aircraft, Inc. ("G&N").

29.   Sherman at Dugosh removed the cylinders, and they were shipped to G&N.

30.   Continental did not request that Becker sign a work order or any other document prior to Dugosh sending the cylinders to G&N.

31.   Continental did not examine the Engine or the cylinders prior to the shipment of the cylinders to G&N.

32.   G&N received the cylinders from Dugosh in September 2012 and inspected and repaired the cylinders under G&N's Work Order No. 69042.

33. G&N was authorized by Continental to perform the cylinder inspection and repair pursuant to the New Engine Warranty and/or Cylinder Warranty.

34. According to its paperwork, G&N performed the following cylinder work: disassemble, sand blast, replace valve and valve seats, install valve guides, hone, final inspection, assembly and check, torque studs, and fit rings.

35. During its inspection and repair and according to its paperwork, G&N rejected some of the parts/materials contained in the Cylinders, specifically the exhaust guides.

36. G&N's Work Order No. 69042 reflects the cylinder work was being performed pursuant to Continental's New Engine Warranty and/or Cylinder Warranty.

37. Following submission of the warranty claim form by Dugosh related to the Engine and/or Cylinders, Continental assigned Warranty Claim No. 224418 to Becker's warranty claim.

38. Continental paid G&N for the work it performed on the cylinders (Work Order No. 69042) under Warranty Claim No. 224418 pursuant to the New Engine Warranty and/or Cylinder Warranty.

39. In mid-October 2012, G&N returned the cylinders to Dugosh to reinstall in the Engine.

40. Following the return of the cylinders from G&N to Dugosh in October 2012, Sherman, among other Dugosh employees, properly reinstalled the cylinders on the Engine in accordance with Continental's instructions and specifications.

41. Following the reinstallation of the cylinders in October 2012, the high oil consumption issue had not been resolved, and, in fact, worsened.

42. Following the reinstallation of the cylinders in October 2012, the Engine fouled spark plugs, burned oil, pushed blue smoke through its exhaust system indicating the presence

of oil being burned, ran rough, dripped oil out of the tailpipes, and failed a magneto check, all of which rendered the Engine not airworthy.

43.   Sherman at Dugosh contacted Gradle at Continental and reported the continued problems with the Engine and cylinders.

44.   Gradle at Continental suggested that Dugosh fly the Aircraft, which Dugosh refused to do because Dugosh considered the Aircraft unsafe and not airworthy.

45.   Dugosh and Continental continued to troubleshoot to try to resolve the issues with the Engine.

46.   In early November 2012, Gradle at Continental again instructed Sherman at Dugosh to remove the cylinders and to return them to G&N for further inspection and/or repair, which Dugosh did.

47.   Continental did not request that Becker sign a work order or any other document prior to Dugosh sending the cylinders a second time to G&N in November 2012.

48.   Continental did not examine the Engine or the cylinders prior to the shipment of the cylinders a second time to G&N in November 2012.

49.   According to its paperwork, G&N, under Work Order No. 69163, performed the following cylinder work: disassemble, hone, final inspection, assemble and check, torque studs, and fit rings.

50.   G&N was again authorized by Continental to perform the cylinder inspection and repair pursuant to the New Engine Warranty and/or Cylinder Warranty.

51.   Continental paid G&N for the work it performed on the cylinders (Work Order No. 69163) under Warranty Claim No. 232212 pursuant to the New Engine Warranty and/or Cylinder Warranty.

52. In late November 2012, G&N returned the cylinders to Dugosh and Sherman properly reinstalled the cylinders on the Engine.

53. Following such reinstallation, the Engine fouled spark plugs, burned oil, pushed blue smoke through its exhaust system indicating the presence of oil being burned, ran rough, dripped oil out of the tailpipes, and failed a magneto check, all of which rendered the Engine not airworthy.

54. Gradle at Continental suggested that Dugosh test fly the Aircraft in order to "break in" the cylinders, which Dugosh again declined to do because Dugosh considered the Aircraft unsafe and not airworthy.

55. Gradle at Continental and Sherman at Dugosh then agreed for Dugosh to perform a "ground run" to simulate flights.

56. Dugosh, at all times relevant, was authorized by Continental to handle the Engine and/or its cylinders/components pursuant to the New Engine Warranty and/or Cylinder Warranty.

57. At no time from September 5, 2012 through the date of the filing of this lawsuit, did Gradle or any other Continental employee personally examine the Engine or the cylinders to determine the presence of a "defect[] in material or workmanship" as set forth in the New Engine and/or Cylinder Warranties.

58. The first time Becker personally spoke with Gradle at Continental was in December 2012.

59. On or about January 25, 2013, Gradle at Continental called Becker and, in a voicemail, requested that the Engine be returned to Continental's factory in Alabama.

60.   On or about January 28, 2013, Becker called Gradle at Continental and left a voicemail that, if Continental thought the Engine needed to be returned to the factory in Alabama, such action seemed like a "path forward" to him.

61.   On or about January 29, 2013, Gradle, on behalf of Continental, told Becker in a phone call that, to return the Engine to the factory in Alabama, Becker would need to sign a work order authorizing the work to be done by Continental.

62.   During this conversation, Continental, for the first time, indicated to Becker that the Engine and/or cylinder issues might not be covered under the New Engine and/or Cylinder Warranties.

63.   Becker requested that Gradle send him a copy of the requested work order.

64.   On or about February 12, 2013, Continental provided Becker with a work order which included the following language:

I hereby authorize the following services and or repair work along with the necessary parts and material, and hereby grant you and/or your employees permission to operate and fly the aircraft herein described for the purpose of testing and/or Inspection.  An express mechanics lien is hereby acknowledged on above aircraft to secure the amount of service and/or repairs thereto.  You will not be held responsible for loss of damage to the aircraft or articles left in the aircraft in case of fire, theft, or any other cause beyond your control.

65.   Becker refused to sign the work order.

66.   On or about February 14, 2013, Becker retained an attorney, Christopher Lyster, who sent Continental a demand letter ("DTPA demand letter") pursuant to the Texas DTPA.

67.   On February 19, 2013, Gradle at Continental requested for a second time that the Engine be shipped to Continental's facility and indicated that the work order form did not need to be signed.

68.   Becker did not send the Engine to Continental.

69. Continental, following receipt of the DTPA demand letter, instructed Dugosh to not touch the Engine further, and Dugosh complied with such instruction.

70. Dugosh has billed Continental the sum of $12,856.69, which Continental has not paid but has acknowledged, through the testimony of its representative Gradle, that it will be paid pursuant to the warranty.

71. Becker filed suit on May 30, 2013.

### III. SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A. Breach of Express Warranty/Breach of Contract Claim

72. To recover for breach of contract, a plaintiff must prove the following: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff; (3) breach by the defendant, and (4) harm to the plaintiff as a result of the breach. *Adams v. H & H Meat Prods., Inc.,* 41 S.W.3d 762, 771 (Tex. App.—Corpus Christi 2001, no pet.); *see Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 813 (S.D. Tex. 2013).

73. Section 2-313 of the Texas Uniform Commercial Code ("UCC"), Tex. Bus. & Com. Code Ann. § 2.313, defines an express warranty as "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."

74. "Under the UCC in Texas, breach of contract and breach of warranty are separate and distinct causes of action, each with different available remedies." *Luig v. N. Bay Enters., Inc.*, 55 F. Supp. 3d 942, 947 (N.D. Tex. 2014).

75. A breach of contract occurs when a party fails to deliver the goods as promised, the buyer has rejected the goods, or the buyer has revoked his acceptance, while a breach of warranty occurs when the seller delivers nonconforming goods. *See Luig*, 55 F. Supp. 3d at 947; *Omni USA, Inc.*, 964 F. Supp. 2d at 812.

76. In this case, Continental delivered the Engine to Becker as promised and Becker accepted such delivery so there was no breach of the purchase contract.

77. Successful assertion of breach of an express warranty requires: 1) an affirmation or promise made by the seller to the buyer; 2) that such affirmation or promise was part of the basis for the bargain, *e.g.*, that the buyer relied on such affirmation or promise in making the purchase;[3] 3) that the goods failed to comply with the affirmation or promise; 4) that there was financial injury; and 5) that the failure to comply was the proximate cause of the financial injury to the buyer. *Omni USA, Inc.*, 964 F. Supp. 2d at 814; *Gen. Supply & Equip. Co, Inc. v. Phillips,* 490 S.W.2d 913, 917 (Tex. Civ. App.—Tyler 1972, writ ref'd n.r.e.).

78. "Unlike an action for breach of an implied warranty which evolved from tort liability, an action for breach of an express warranty sounds in contract." *Lindemann v. Eli Lilly and Co.*, 816 F.2d 199, 202 (5th Cir. 1987) (citing *Smith v. Kinslow,* 598 S.W.2d 910, 912 (Tex. Civ. App.—Dallas 1980, no writ)).

79. To determine the precise elements of an action for breach of express warranty, the Court must examine the specific contract and the warranties made under that contract. *See Hodge Boats and Motors v. King,* 578 S.W.2d 890, 891 (Tex. Civ. App.—Beaumont 1979, writ ref'd n.r.e.) (stating that where the defendant warranted a motor to be "free from defects in material and workmanship," plaintiff must offer proof of defect in action for breach of express warranty).

---

[3] Plaintiff must show that he relied on the express warranty.  *See* Tex. Bus. & Com. Code Ann. § 2.313(a)(1) (West 2009); *Ackermann v. Wyeth Pharm.*, 471 F. Supp. 2d 739, 744 (E.D. Tex. 2006) ("In Texas, reliance is not only relevant to, but an element of proof, for sustaining a claim for breach of an express warranty."); *Henry Schien, Inc. v. Stromboe*, 102 S.W.3d 675, 686 & n.23 (Tex. 2002) (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997)).

80.  "To establish breach of the express warranty to repair, a plaintiff must show not only that the product was presented to the defendant for repair but also that the defendant failed or refused to repair the defect." *Gen. Motors Corp. v. Garza*, 179 S.W.3d 76, 82 (Tex. App.—San Antonio 2005, no pet.).

81.  Continental's New Engine Warranty and/or Cylinder Warranty were each valid and enforceable warranty contracts and neither Continental nor Becker has challenged the existence of a valid contract or the express warranties.

82.  The Engine and its cylinders were covered by Continental's New Engine Warranty and/or Cylinder Warranty at the time of purchase in April 2011 and through the time the warranty claim was submitted in September 2012.

83.  The New Engine Warranty and Cylinder Warranty made an affirmation or promise from Continental to Becker that Continental would repair or replace on an exchange basis any engine, component or part manufactured or supplied or any cylinder component or related part manufactured or supplied that "upon examination" by Continental was found "to be defective in material or workmanship" within certain time periods or hours of operation of the Engine.

84.  Becker relied upon the New Engine Warranty and/or Cylinder Warranty when he purchased the Engine.

85.  Becker timely presented Continental with a valid warranty claim under the New Engine Warranty and/or Cylinder Warranty.

86.  To the extent same may have been required under either the New Engine Warranty and/or Cylinder Warranty, Becker fully performed any obligation or condition precedent that he

may have had under either of such warranties or was excused from doing so by Continental's breach of same.

87. The Court finds by a preponderance of the evidence that a defect in material and/or workmanship existed in the Engine and/or cylinders, including but not limited to the following:

   a. The oil consumption rate reflected on the warranty claim form (one quart every two hours) evidences the existence of a defect in material and/or workmanship in the Engine and/or cylinders given the fact that the Engine only had 336.5 hours on it at that time;

   b. The Engine and its cylinders contained defects in materials and workmanship as evidenced by excessive oil entering into the combustion chamber in the cylinders on the Engine, resulting in: (1) the Engine running rough, (2) spark plug fouling, (3) burning oil, (4) oil dripping out of the tail pipe, and (5) failing a magneto check;

   c. G&N specifically found that the cylinders were defective in materials or workmanship by rejecting and replacing the exhaust guides during the first repair attempt in September 2012 pursuant to work order 69042;

   d. Sherman at Dugosh credibly testified[4] that the cylinders were defective in materials or workmanship as shown by an excessive oil control problem and that all other causes for such problem had been eliminated;[5] and

---

[4] Part of Sherman's credibility stems from the fact that he is an aircraft mechanic  and that he: (1) had originally installed and maintained the Engine, (2) had reinstalled the cylinders when they were returned from G&N on two occasions, and (3) is the person that Continental relied on to try and troubleshoot issues with the Engine and cylinders.

[5] The Court notes that on cross examination and redirect, Sherman testified that the defect was not a design defect in his opinion but could be either a manufacturing defect or an installation problem caused by G&N, who was an authorized representative of Continental.  Regardless of whether the defect was the result of a manufacturing

e.  Finally, Chip McClellan, one of Continental's experts, recommended in his expert report made as a result of his inspection of the Engine in November 2013 that, *inter alia*, all cylinders be replaced "to correct oil consumption issue."[6]

88.  In addition, Continental's authorization of and payment to G&N for the work it performed in September 2012 under G&N's Work Order No. 69042 pursuant to the applicable warranties, specifically Warranty Claim No. 224418, evidences that Continental was either satisfied that a defect in materials or workmanship existed or treated the warranty claim as if a defect in materials or workmanship existed. *See, e.g.*, *Sw. Louisiana Hosp. Ass'n v. BASF Const. Chems., LLC*, 947 F. Supp. 2d 661, 679-80 (W.D. La. 2013) (citing a case and finding that that the manufacturer's conduct in making the problem worse and not asserting the warranty remedy limitations of refund or replacement until the filing of the lawsuit results, in essence, a waiver that prevents the successor-manufacturer from limiting liability to the terms of the warranty).[7]

89.  Continental's payment to G&N for the work it performed in November 2012 under G&N's Work Order No. 691632 pursuant to the applicable warranties, specifically Warranty Claim No. 232212, show again that Continental was either satisfied that a defect in materials or workmanship existed or treated it as if a defect in materials or workmanship existed.

---

defect or installation issue, the evidence supports a finding that there was a defect in materials or workmanship for which Continental is responsible.

[6] The Court notes that McClellan testified that he made such recommendation based on client goodwill. Nevertheless, in light of the other evidence in the record regarding defective cylinders, the Court finds that this is some supporting evidence of a defect.

[7] While Becker may not have expressly argued any form of estoppel, the Court notes that Texas recognizes the doctrines of equitable estoppel and quasi-estoppel. However, the Court will not analyze nor draw any conclusions as to the applicability of these doctrines since they were not fully presented and briefed by the parties.

90. Continental's repairs led Dugosh and/or Becker to reasonably conclude that Continental had accepted that the Engine and/or cylinder issues were covered by the New Engine Warranty and/or Cylinder Warranty.

91. Continental failed to repair the defective Engine/and or cylinders in a timely manner sufficient to resolve the defective condition.

92. Becker has been unable to fly his plane since September 5, 2012.

93. Continental's actions in attempting to require Becker to execute the subject work order were grounds for Becker to reasonably conclude that Continental was no longer treating this as a warranty claim and was in breach of the warranty.

94. Becker's refusal to sign the work order and his conclusion that Continental was not going to repair or replace the Engine and/or cylinders under the warranties was reasonable.

95. For the above reasons, the Court finds that Continental breached the New Engine Warranty and/or Cylinder Warranty.[8]

96. Pursuant to Texas Business and Commerce Code § 2.714(b) & (c), which is a codification of Article 2 of the UCC, the "measure of damages for breach of warranty is the difference between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages

---

[8] Although no Continental employee ever examined the Engine or cylinders prior to requesting that Dugosh send the cylinders to G&N for repairs on two separate occasions, the Court stops short of finding that Continental breached the New Engine Warranty and/or Cylinder Warranty for this reason since G&N arguably inspected the cylinders on behalf of Continental. *See, e.g., Lear Siegler Servs. v. Ensil Int'l Corp.*, No. SA-05-CA-679-XR, 2007 WL 4413414, at *4 (W.D. Tex. Dec. 17, 2007) (finding that Defendant's failure to perform its contractual obligation under the warranty to inspect and determine whether the repaired parts returned to it were defective resulted in Defendant breaching its warranty contract).

of a different amount," as well as any incidental and consequential damages.  Tex. Bus. & Com. Code Ann. § 2.714 (West 2009).[9]

97.   The evidence of Becker's direct damages proximately caused by Continental's breach of warranty is as follows:

    a.   Removal, replacement and reinstallation of a new

        Continental IO-550-N8B engine           $55,906.00

    b.   Hangar rental through 8/31/2015       + $  4,000.00
                                             $59,906.00

98.   Becker claims additional damages for "loss of use" as follows:[10]

    a.   Loss of use 9/5/2012-10/13/2013        $36,130.76

    b.   Loss of use 10/13/2013-8/15/2015    + $16,393.00[11]
                                             $52,523.76

99.   Pursuant to the language in the New Engine Warranty and/or Cylinder Warranty and the definitions of consequential and incidental damages in the UCC, such loss of use damages, are not recoverable as direct damages in this case.  *See* Court's March 24, 2015 Memorandum Opinion and Order Denying Defendant's Motion for Summary Judgment [doc. 50] at 7; *see also* Tex. Bus. & Com. Code Ann. §§ 2714(b), (c), 2715.

---

[9] In a diversity case, the determination of damages is substantive, and, thus, is governed by state law. *See Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 398 (5th Cir. 2013).

[10] Becker also claims he should be awarded $12,856.69 for work performed by Dugosh at Continental's direction.  However, there is no evidence that Dugosh has sought such amount from Becker.  Instead, the evidence shows from the testimony of Gradle at Continental that Continental would pay Dugosh directly for the work performed.  Thus, the award of these damages to Becker is neither appropriate nor supported by the evidence.

[11] The Court does not accept Becker's "Time Value" of purchasing the replacement aircraft of $8183 per year, calculated at $22.40 a day, as such damages are speculative and not supported by the evidence.  Thus, the loss of use from 10/13/2013-8/15/2015 when subtracting out the "Time Value" of purchasing the replacement aircraft is $16,393, which is computed as (.65 hr./day ($37.30/hr.) = $24.25/day x 676 days.  Consequently, the Court sustains Defendant's objection at trial to the "Time Value" of purchasing the replacement airplane at a 5.83% per annum rate as such damages are speculative and not supported by the evidence.

100. Under section 2.719(b) of the Texas Business & Commerce Code, if the only remedies available to Becker under the warranties fail of their essential purpose, consequential and incidental damages are available in some cases. *See, e.g., Mercedes-Benz of North America, Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App.—Fort Worth 1986, no writ).

101. A limitation of remedies fails of its essential purpose when the damages limitations cause the plaintiff to lose the "substantial value of their bargain when the warrantor does not correct the defects within a reasonable time." *Mercedes-Benz,* 720 S.W.2d at 854 (a limited car warranty failed its essential purpose where warranty was unable to correct all of the defects even though the buyer had returned the car for repairs at least seven times over an eight-month period and the transmission had been replaced at least twice).

102. However, even if a limitation of remedies fails of its essential purpose, consequential and incidental damages will not be recoverable if there is a valid limitation of damages clause in the warranty that excludes any and all liability for consequential or incidental damages[12] unless the limitation of damages regarding consequential damages is found to be unconscionable.[13]

---

[12] The Court notes that in its March 24, 2015 Memorandum Opinion and Order Denying Defendant's Motion for Summary Judgment, the Court, when reviewing Becker's ability to recover loss of use damages, stated that because the "Court agrees with Becker that a fact question exists whether the only remedy available to Becker under the warranties failed, which would make consequential and incidental *potentially* available to Becker, summary judgment on the issue of loss of use as a consequential or incidental damage is DENIED." (Court's March 24, 2015 order at 7 (emphasis added).) After reviewing the case law, the Court concludes that loss of use damages as a consequential damage are ultimately not available because the recovery of consequential damages in the warranties was expressly excluded and such limitation of liability is not unconscionable.

[13] *See* Tex. Bus. & Com. Code Ann. § 2.719(c) (West 2009) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."); *Pine Telephone Co., Inc. v. Alcatel-Lucent USA Inc.*, No. 14-7012, 2015 WL 1383109, at*10 n.6 (10th Cir. Mar. 27, 2015) (noting in a footnote that even if Plaintiff had preserved its breach of warranty claim (which the court found it had waived) and succeeded in proving the warranty provision's limitation in the agreement to repair and replace had failed of its essential purpose, Defendant had disclaimed liability for all consequential damages for any claim arising out of the agreement); *Orthoflex, Inc. v. Thermotek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2013 WL 4045206, at *7 n.14 (N.D. Tex. Aug. 9, 2013) ("The court is not holding that, if plaintiffs prove at trial that the express warranties fail of their essential purpose, plaintiffs can recover consequential damages" as "the viability of a provision limiting liability for consequential damages is not dependent on the success of the remedy in the limited warranty clause") (internal quotations and

103. In this case, the only remedies available to Becker, repairing or replacing the Engine, under the applicable warranties failed of their essential purpose because Continental, after unsuccessfully attempting to repair the engine on two occasions over a period of just over five months, told Becker that he would need to sign a work order authorizing further work to be done by Continental and there was never an offer to replace the engine.

104. Thus, Becker was deprived of the use of his Aircraft for an unreasonably extended period of time.

105. Nevertheless, as set forth in the findings herein above, there is a valid limitation of damages clause in both the New Engine Warranty and Cylinder Warranty, and there is no evidence that such clause is unconscionable.

106. Thus, Continental is *not* liable to Becker for loss of use damages in the amount of $52,523.76.

107. Consequently, the total of all of Becker's recoverable damages for Continental's breach of express warranty is $59,906.00.

B. **Violations of the Texas Deceptive Trade Practices Act**

108. As relevant here, a consumer may maintain an action under the Texas DTPA where any of the following constitute a producing cause of economic damages:

---

citations omitted)); *Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.*, No. CIV.A. H-02-98, 2005 WL 6792280, at *15 (S.D. Tex. Sept. 30, 2005), *rev'd in part on other grounds*, No. CIV-H-02-0098, 2005 WL 3371875 (S.D. Tex. Dec. 12, 2005) (predicting that "the Texas Supreme Court would hold that a limitation of liability clause that purports to exclude any and all liability for consequential damages . . . cannot be voided even if a limited remedy clause fails of its essential purpose"); *Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 721 (S.D. Tex. 2000) (citing cases and concluding that a majority of jurisdictions concluded that "a waiver of consequential damages can be valid notwithstanding the fact that a limitation of remedy has failed of its essential purpose"). *See also Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide LLC*, 35 F. Supp. 3d 1316, 1331 (D. Or. 2014) (citing cases and noting that "Courts are divided as to whether a limitation on consequential damages is automatically unenforceable when an exclusive remedy limitation is found to fail of its essential purpose" and stating that it need not reach such issue under Texas or Oregon law because it found that the consequential damages limitation would be unenforceable regardless because it was unconscionable).

    a.  the use or employment by a person of a false, misleading, or deceptive act or practice that is enumerated in a subdivision of subsection (b) of section 17.46 and is relied on by a consumer to a consumer's detriment; and

    b.  breach of an express warranty.

Tex. Bus. & Com. Code § 17.50(a).

109.  Becker is a consumer as that term is defined under section 17.45(4) of the Texas Business & Commerce Code.

110.  The evidence does not support Becker's claims under the Texas DTPA that Continental engaged in "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" by:[14]

    a.  Representing that goods and/or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not. [Tex. Bus. & Comm. Code, §17.46(b)(5).]

    b.  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another [Tex. Bus. & Com. Code Ann. § 17.46(b)(7).]

---

[14] The Court notes that "[t]he mere failure to perform a promise does not constitute a misrepresentation actionable under the DTPA unless it can be shown that at the time the promise was made, the promisor had no intentions of fulfilling the promise." *Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998, 1006 (5th Cir. 1997); *see , e.g.*, *Robinson v. Match.com, L.L.C.*, No. 3:10-CV-2651-L, 2012 WL 3263992, at *15-16 (N.D. Tex. Aug. 10, 2012) (dismissing DTPA claim in which the defendant allegedly "made certain misrepresentations regarding its dating services to get Plaintiffs to subscribe or renew their subscriptions, " since the claim, at its "essence," was "virtually identical" to Plaintiff's breach of contract claim); *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 742-43 (Tex. App.—Fort Worth 2005, no pet.) (stating that the failure to perform a term of a contract, without more is "simply not a violation of the DTPA" and that determining whether a breach of contract may also rise to the level of a misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry that is, ultimately, a question of law).

      c.  Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. [Tex. Bus. & Comm. Code, §17.46(b)(12).]

      d.  Knowingly making false or misleading statements of fact concerning the need for parts, replacement or repair service. [Tex. Bus. & Comm. Code, §17.46(b)(13).]

111.  Pursuant to section 17.50(a)(2) of the Texas Business & Commerce Code and as relevant here, a consumer may maintain an action under the Texas DTPA where a breach of an express warranty constitutes a producing cause of economic damages.

112.  In connection with the Engine sold to Becker, Continental breached an express warranty as set forth above.  [Tex. Bus. & Comm. Code, §17.50(a)(2).]

113.  Becker complied with Texas Commerce & Business Code §17.505 by giving written notice to Continental at least 60 days before filing suit advising Continental in reasonable detail of Becker's specific complaints, the amount of economic and other damages at such time, including attorneys' fees incurred by Becker in asserting such claims against Continental.

114.  Following delivery of written notice and prior to suit, Continental failed to request an inspection in a reasonable manner and at a reasonable time and place of the goods that are the subject of Becker's action and/or claim.

115.  Continental's violations of the Texas DTPA were the producing cause of economic damages suffered by Becker.

116.  Section 17.50(b), which sets forth damages, states:

    (b) In a suit filed under this section, each consumer who prevails may obtain:

        (1)  the amount of economic damages found by the trier of fact.  If the trier of fact finds that the conduct of the Continental was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the

amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;

(2)   an order enjoining such acts or failure to act;

(3)   orders necessary to restore to any party to the suit any money or property, real or personal, which may have been acquired in violation of this subchapter; and

(4)   any other relief which the court deems proper . . . .

Tex. Bus. & Com. Code Ann. § 17.50(b).

117. Continental's Texas DTPA breach of warranty was the producing cause of the following direct damages incurred by Becker:

a.   Removal, replacement and reinstallation of a new

Continental IO-550-N8B engine                    $55,906.00

b.   Hangar rental through 8/31/2015          + $  4,000.00
                                                 $59,906.00

118. Because the Texas DTPA does not create an independent claim for breach of warranty, Becker's claim under the Texas DTPA for breach of warranty is substantively the same as Becker's claim under the UCC for breach of warranty.  *See Ackermann v. Wyeth Pharmaceuticals*, 471 F. Supp. 2d 739, 744 (E.D. Tex. 2006) ("Warranties actionable under the DTPA, both express and implied, must be first recognized by common law or created by statute."); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995); *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex.1984) ("[T]he [DTPA] does not create any warranties; therefore any warranty must be established independently of the act.").

119. As a result, Becker's inability to collect consequential damages pursuant to his claim of breach of express warranty due to the valid limitation of damages clauses in the New Engine

Warranty and/or Cylinder Warranty, equally applies to his claim for breach of warranty pursuant to the Texas DTPA.[15]

120. Thus, again Continental is *not* liable to Becker for loss of use damages sought for the reasons set forth above.

121. Continental is liable to Becker for damages for violations of the Texas DTPA in the amount of $59,906.00.

122. The offending conduct of Continental was not committed knowingly or intentionally; thus, no trebling of damages is appropriate in this case.

123. Continental failed to a make an offer of settlement in compliance with Texas Business & Commerce Code § 17.5052.

### C.  Declaratory Relief

124. A dispute exists between Becker and Continental regarding the parties' respective rights, status and other legal relations arising out of the purchase and sale of the Continental IO 550 Engine in question and the Engine and Cylinder warranties that accompanied that Engine.

125. Becker is entitled to a declaration that the Engine and/or cylinders are defective as defined under the respective warranties.

### D.  Defendant's Affirmative Defenses

126. Continental has failed to prove any affirmative defense by a preponderance of the evidence.

---

[15] *See Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 812 (Tex. App.—Dallas 1999, no pet.) (stating that plaintiff's Texas DTPA claim based on an alleged breach of an express warranty that contained a limitation of damage clause limited defendant's liability to $350 was enforceable as to the DTPA breach of express warranty claim); *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d. 572, 577 (Tex. 1991) (concluding that limitation of damages clauses are enforceable under DTPA claims based on breach of an express warranty (as opposed to a Texas Business & Commerce Code section 17.46(b) DTPA "laundry list" claim) because the warranty becomes part of the basis of the bargain between the parties). *See also Materials Mktg. Corp. v. Spencer*, 40 S.W.3d 172, 175 (Tex. App.—Texarkana 2001, no pet.) (stating that "[b]reach of warranty claims derive from common-law principles or non-DTPA statutes, so these sources would have to be consulted in determining the validity of the disclaimer" as to a claim for breach of warranty brought under the DTPA).

**E. Attorneys' Fees**

127. "Generally under Texas Law, attorney's fees and litigation expenses may not be recovered unless provided for by statute or by contract between the parties." *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, 612 F.3d 800, 807 (5th Cir. 2010).

128. It became necessary for Becker to hire counsel in order to seek to recover damages against Continental for breach of express warranty, violations of the Texas DTPA, and declaratory relief.

129. Becker is entitled to recover from Continental his reasonable and necessary attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice & Remedies Code and section 17.50(d) of the Texas DTPA.[16]

130. Becker has presented his claim for attorneys' fees and at no time has Continental tendered payment for any just amount owed before the expiration of the 30th day after Becker presented his claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.002.

131. Becker's attorneys' fees are not consequential damages[17] in this case but are provided for by statute as set forth above.[18]

---

[16] While it appears that prior to 2008 there was at some point a question whether attorneys' fees were recoverable for a breach of express warranty claim in Texas, the Texas Supreme Court in *Medical City Dallas, Ltd., v. Carlisle Corporation,* 251 S.W.3d 55 (Tex. 2008) explicitly ruled that breach of an express warranty is a claim based on a written or oral contract, and, thus, attorneys' fees were permitted pursuant to Texas Civil Practice and Remedies Code § 38.001(8). *See also Structural Metals, Inc. v. S & C Elec. Co.*, No. SA-09-CV-984-XR, 2013 WL 3790307, at *1 (W.D. Tex. July 19, 2013); *S. Tex. Elec. Coop. v. Dresser-Rand Co.*, No. V-06-28, 2010 WL 1855959, at *1 (S.D. Tex. May 5, 2010) (stating that Texas Civil Practice & Remedies Code § 38.001(8) also applies to express warranty actions.); *½ Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 388 (Tex. 2011) (acknowledging that in *Medical City*, the court "held that attorney's fees were available under section 38.001(8) for an article 2 breach of express warranty claim.").

[17] The Court notes that in its March 24, 2015 Memorandum Opinion and Order Denying Defendant's Motion for Summary Judgment, the Court, raising some questions regarding the recoverability of attorney's fees under the UCC under Texas law and the potential that such fees may be recovered under the UCC as consequential damages, denied Defendant's motion for summary judgment on this issue. After additional research and analysis, the Court concludes, as set forth herein, that Becker is entitled to recover attorney's fees pursuant to statute and not as a consequential damage.

132. Becker has incurred $195,468.71 as reasonable and necessary attorneys' fees, costs and expenses in prosecuting his claims in this case.

133. The Court has considered Plaintiff's Notice of Submission of Affidavit in Support of Recoverable Attorneys' Fees and Expenses, Defendant's Notice of Submission of Controverting Affidavit Concerning Recoverable Attorneys' Fees and Expenses ("Controverting Affidavit"),[19] and the factors from section 1.04 of the Texas Disciplinary Rules of Professional Conduct and *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

134. These factors include the following: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to this case; (5) the customary fee; (6) the amount involved and the results obtained; (7) time limitations; (8) the nature and length of the professional relationship with the client; (9) the experience, reputation and ability of counsel; and (10) whether the fee is fixed or contingent.

135. Based upon these factors, the Court finds that the attorneys' fees and expenses incurred by Becker were and are reasonable, including a reduced rate of $285 per hour charged, and the services performed were and are necessary and incorporates paragraphs 11 through 14 of

---

[18] The Court notes that attorney's fees are only considered consequential damages in certain limited contexts not presented here. *See Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, No. 3:07-CV-924-O, 2011 WL 3163605, at *6 (N.D. Tex. July 27, 2011) ("The standard for an award of attorney's fees as consequential damages is whether the wrongful act of another forces it to prosecute or defend itself against in a third party lawsuit.") (internal citations and quotations omitted). *See also Cadle Co. v. Sweet & Brousseau, P.C.*, No. 3:97-CV-298-L, 2007 WL 1958915, at *3 (N.D. Tex. June 28, 2007 (comparing cases and discussing attorney's fees as consequential damages as a possible exception to the general rule that attorney's fees may only be recovered when provided by statute or contract in cases when a plaintiff is involved in litigation with third parties, which might make attorney's fees incurred as a consequence of a wrongful act recoverable).

[19] The Court notes that Defendant's Controverting Affidavit was directed to the merits of Becker's ability to recover attorneys' fees and costs as opposed to any challenge to the reasonable and necessary nature and amount of such attorneys' fees and costs.

Plaintiff's Notice of Submission of Affidavit in Support of Recoverable Attorneys' Fees and Expenses regarding an analysis of the above-listed factors.

136. Consequently, Continental is liable to Becker for reasonable and necessary attorneys' fees and expenses through trial in the amount of $195,468.71, and $40,000 for reasonable appellate attorneys' fees in the event of an appeal to the United States Fifth Circuit Court of Appeals, and $20,000 in the event Becker must file a response to any Petition for Writ of Certiorari filed with the United States Supreme Court, and $40,000 if the Petition for Writ of Certiorari is granted.

### III.  CONCLUSION

Based on the foregoing, it is **ORDERED** that Continental is liable to Becker as follows:

1. Because the damages under both breach of warranty and violations of the Texas DTPA are the same, no election of damages is required since Becker is entitled to damages in the amount of $59,906.00 under either cause of action.[20]

2. Reasonable and necessary attorney's fees, costs, and expenses in the amount of $195,468.71, reasonable appellate attorneys' fees in the event of an appeal to the United States Fifth Circuit Court of Appeals in the amount of $40,000, an additional $20,000 in

---

[20] "Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991). "There can be but one recovery for one injury, and the fact that . . . there may be more than one theory of liability does not modify this rule." *Sterling*, 822 S.W.2d at 8. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) ("While [the plaintiff] could certainly plead more than one theory of liability, [the plaintiff] could not recover on more than one."); *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) ("A party is generally entitled to sue and to seek damages on alternative theories" but "is not entitled to a double recovery"); *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief."); *see also* Tex. Bus. & Com. Code Ann. § 17.43 (providing that "no recovery shall be permitted under both this subchapter and another law of both damages and penalties for the same act or practice") (West 2011).

the event a Petition for Writ of Certiorari is filed with the United States Supreme Court, and an additional $40,000 in the event such Petition is granted.

It is further **ORDERED** that Becker is entitled to prejudgment interest at a rate of 5% per year from May 30, 2013, the date the suit was filed, to the day preceding the date judgment is rendered. *See* Tex. Fin. Code Ann. §§ 304.102, 304.103, 304.104 (West 2006).[21]

It is further **ORDERED** that post-judgment interest shall accrue on the entire amount at a rate of .31% from the date this judgment is entered on the docket until paid. *See* 28 U.S.C. § 1961; *Boston Old Colony Ins. Co. v. Tiner Assocs., Inc.*, 288 F.3d 222, 234 (5th Cir. 2002) (noting that federal post-judgment interest statute applies even in diversity cases).

SIGNED November 2, 2015.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

---

[21] *See Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) (stating that state law governs the award of prejudgment interest in diversity cases); *Giddy Up, LLC v. PRISM Graphics, Inc.,* No. 3:06-CV-0948-B, 2007 WL 3125312, at *1 (N.D. Tex. Oct. 24, 2007) (awarding prejudgment interest on actual damages assessed under Texas state law claims, including DTPA violations, and noting that prejudgment interest does not accrue on any attorneys' fees awarded); *Metro Nat. Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 562, 568 (S.D. Tex. 1997) (allowing recovery of prejudgment interest in case where Defendant was found liable of breach of warranties and fraud). Furthermore, under the Texas Finance Code, the prejudgment interest rate is the same as the post-judgment interest rate. *See* Tex. Fin. Code Ann. § 304.103 (West 2006). Moreover, under the statutory scheme, prejudgment interest is computed as simple interest and accrues on the earlier of (1) 180 days after the date the defendant receives written notice of a claim or (2) the date the suit is filed. *Id.* § 304.104. The most applicable post judgment interest rate in this case is the rate specified in Texas Finance Code § 304.003(c), which is currently set at five percent (5%). *See, e.g.*, *Humphrey v. United Way of Texas Gulf Coast*, CIV. A. H-05-758, 2008 WL 5070057, at *8 (S.D. Tex. Nov. 20, 2008); *see also* Bd. of Governors of the Fed. Reserve Sys., *Selected Interest Rates (Weekly)* (November 2, 2015), http://www. federalreserve.gov/releases/h15/current/ (reporting that the prime rate as of October 30, 2015 is 3.25%).